**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.:  9:11-cv-81393-KLR**

MELISSA R. BLOOM,

     *Plaintiff,*

v.

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,

     *Defendant.*

_____/

**AMENDED COMPLAINT** [1]

     Plaintiff, Melissa R. Bloom ("Bloom"), sues Defendant, Hartford Life and Accident Insurance Company ("Hartford"), as follows:

**NATURE OF THE ACTION, PARTIES,**
**JURISDICTION AND VENUE**

     1.    This is an action arising under the laws of the United States, specifically the Employee Retirement Income Security Act of 1974, Title 29, United States Code, Sections 1000-1461 ("ERISA"), for Hartford's wrongful discontinuation of Bloom's group long-term disability benefits and group life insurance coverage.

     2.    Bloom was at all material times a citizen and resident of Boca Raton, Florida, and is in all respects *sui juris*.

     3.    Upon information and belief, Hartford was at all material times an insurance company incorporated in the State of Connecticut and engaged in the business of selling disability and life insurance in Palm Beach County, Florida.

---

[1] The deadline within which to amend pleadings is May 4, 2012.  [D.E. 7].  Counsel for Defendant has agreed to this amendment.

4.       This Court possesses original jurisdiction pursuant to Title 29, United States Code, Section 1132(e), and Title 28, United States Code, Section 1331.

5.       Venue is proper in the Southern District of Florida pursuant to Title 29, United States Code, Section 1132(e)(2) and Title 28, United States Code, Section 1391, since the contracts for insurance between the parties were entered into in this judicial district and various events or omissions giving rise to this suit occurred in this judicial district.

## COMMON ALLEGATIONS

6.       Bloom, 40, worked as a Speech – Language Pathologist from 1995 to January 28, 2010.  For the approximate three years leading up to January 28, 2010, Bloom worked as a Speech – Language Pathologist for RehabCare Group, Inc. ("RehabCare").

7.       On March 16, 2009, Bloom suffered a stroke.  Ever since, she has suffered from various, residual physical ailments (*e.g.*, seizures) and cognitive deficits (*e.g.*, memory loss).

8.       Bloom was hospitalized for approximately one-week following her stroke and remained out of work for approximately two months thereafter.  At the end of May 2009, Bloom attempted a return to work.  The residual effects of her stroke, however, prevented (and continue to prevent) Bloom from performing one or more of the essential duties of her job.  Bloom's last day working with RehabCare was January 28, 2010.

9.       In 2010, group short-term and long-term disability benefits were applied for, approved, and paid.  In November 2010, group life insurance premiums were waived effective July 28, 2010.

10.       Disability benefit payments continued under the group long-term disability policy until June 2011, when Hartford decided Bloom was no longer disabled.  In July 2011, Hartford notified Bloom that her basic group life insurance coverage and premium waiver was

discontinued as a result of disability claim discontinuation.  In October 2011, Hartford's appeals unit ratified the disability claim discontinuation.   Hartford's claim discontinuation (and associated discontinuation of basic group life insurance coverage and premium waiver) was incorrect, unreasonable, and arbitrary; hence, this lawsuit.

***The Group Long-Term Disability Policy***

11.    Hartford issued Group Disability Insurance Policy No. GLT-395222 (the "Policy") to RehabCare, and the Policy was part of an employee welfare benefit plan (the "Plan") within the meaning of Title 29, United States Code, Section 1002(3).

12.    Bloom was covered under the Policy as a Plan participant within the meaning of Title 29, United States Code, Section 1002(7).   At all material times, 100% of premium payments were made by Bloom for her disability coverage under the Policy.

13.    Pursuant to Bloom's request for the Policy following Hartford's appeal decision, Hartford provided a copy of the summary plan description.   Similarly, RehabCare provided Bloom with a copy of the summary plan description upon request for plan documents.   The summary plan description (a/k/a/ the benefit plan or certificate of insurance, hereafter the "Certificate") is attached as Exhibit A.[2]

14.    Hartford is a Plan fiduciary within the meaning of Title 29, United States Code, Section 1002(21)(A).  More specifically, "[t]he Plan … designated and named [Hartford] as the claims fiduciary for benefits provided under the Policy … [and] granted [Hartford] full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy."  Exhibit A at 29.

15.    Per the Certificate, "Disability/Disabled" is defined as follows:

---

[2]  "This employee welfare benefit plan (Plan) is subject to certain requirements of the Employee Retirement Income Security Act of 1974 (ERISA), as amended."  Exhibit A at 29.

You are prevented from performing one or more of the Essential Duties of:
1) Your Occupation during the Elimination Period;
2) Your Occupation, for the 24 month(s) following the Elimination Period, and as a result Your Current Monthly Earnings are less than 80% of Your Indexed Pre-disability Earnings; and
3) after that, Any Occupation.

***

Your Disability must result from: … 2) sickness… .

Exhibit A at 20.

16.     "Essential Duty means a duty that:  1) is substantial, not incidental; 2) is fundamental or inherent to the occupation; and 3) cannot be reasonably omitted or changed. Your ability to work the number of hours in Your regularly scheduled work week is an Essential Duty."  Exhibit A at 20.

17.     "Your Occupation means Your Occupation as it is recognized in the general workplace.  Your Occupation does not mean the specific job You are performing for a specific employer or at a specific location."  Exhibit A at 23.

18.     The Certificate affords coverage for 66 2/3% of monthly income, less other sources of deductible income.  Exhibit A at 8.  Maximum monthly benefits total $7,500.00, with a maximum duration to age 67.  Exhibit A at 8-9.

19.     "Benefit payments will stop on the earliest of:  1) the date You are no longer Disabled… ."  Exhibit A at 14.

20.     As for claim decisions:

If a claim for benefits is wholly or partly denied, You will be furnished with written notification of the decision.  This written notification will:  1) give the specific reason(s) for the denial; 2) make specific reference to The Policy provisions on which the denial is based; 3) provide a description of any additional information necessary to perfect a claim and an explanation of why it is necessary; and 4) provide an explanation of the review procedure.

Exhibit A at 17.

21.     As for appeal decisions:

On any claim, You or Your representative may appeal to Us for a full and fair review.  To do so You: … 2) may request copies of all documents, records, and other information relevant to Your claim; and 3) may submit written comments, documents, records and other information relating to Your claim.

We will respond to You in writing with Our final decision on the claim.

Exhibit A at 18.

### *The Group Life Insurance Policy*

22.     Hartford issued Group Life Insurance Policy No. GL-395222 (the "Life Policy") to RehabCare, and the Life Policy was part of an employee welfare benefit plan (the "Life Plan") within the meaning of Title 29, United States Code, Section 1002(3).

23.     Bloom was covered under the Policy as a Life Plan participant within the meaning of Title 29, United States Code, Section 1002(7).  At all material times, 100% of premium payments were made by RehabCare for Bloom's life insurance coverage under the Life Policy. Beginning July 28, 2010, Hartford waived the Life Policy premium until the date of termination – July 31, 2038.

24.     Bloom's basic life insurance coverage totaled $80,000.00.

25.     RehabCare provided Bloom with a copy of the life insurance summary plan description upon request for plan documents.  The summary plan description (a/k/a/ the benefit plan or certificate of insurance, hereafter the "Life Certificate") is attached as Exhibit B.

26.     Hartford is a Life Plan fiduciary within the meaning of Title 29, United States Code, Section 1002(21)(A).  More specifically, Hartford has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the

CASE NO.:  9:11-cv-81393-KLR

Policy.  This provision applies where the interpretation of the Policy is governed by [ERISA]."

Exhibit B at 21.

      27.     Per the Life Certificate:

You will become eligible for coverage on the latest of:
1) the Policy Effective Date;
2) the date You become a member of an Eligible Class; or
3) the date You complete the Eligibility Waiting Period for Coverage shown in the Schedule of Insurance, if applicable.

Exhibit B at 9.

      28.     The Life Certificate defines "Eligible Class" as "[a]ll Full-time and Part-Time Active Employees… ."  Exhibit B at 8.

      29.     Per the Life Certificate, "Waiver of Premium is a provision which allows You to continue Your and Your Dependent's Life Insurance coverage without paying premium, while You are Disabled and qualify for Waiver of Premium."  Exhibit B at 14.

      30.     The Life Certificate provides that if Hartford:

approve[s] Waiver of Premium, [Hartford] will notify You of the date [it] will begin to waive premium.  [Hartford] ha[s] the right to:  1) require Proof of Loss that You are Disabled; and 2) have You examined at reasonable intervals during the first 2 years after receiving initial Proof of Loss, but not more than once a year after that.

Exhibit B at 15.

      31.     The Life Certificate further provides that Hartford "will waive premium payments and continue Your coverage, while You remain Disabled, until the date You attain Normal Retirement Age if Disabled prior to age 60."  Exhibit B at 16.

***Bloom's Disability***

      32.     On March 16, 2009, Bloom suffered a stroke.  Ever since, she has suffered from disabling physical ailments and cognitive deficits.

33.    Per the objective records and attending physician statements of Bloom's treating neurologist, Dr. Robert O. Schiftan ("Dr. Schiftan"), contained within Hartford's administrative record, Bloom suffers from:  (a) cerebral thrombosis with cerebral infarction (ICD-9 434.01), (b) petit mal status epilepsy / seizure (ICD-9 345.2), (c) localization related (focal) (partial) epilepsy and epileptic syndromes with complex partial seizures (ICD-9 345.40), (d) late effects CVA (speech and language deficits) (ICD-9 438.1), (e) fatigue, (f) memory loss, and (g) right side arm and hand weakness and numbness.

34.    Moreover, Bloom's seizures sometimes impair her vision (*e.g.*, sensitivity to light), cause difficulties with speech, and induce migraines.

35.    Bloom takes various medications in an effort to lessen the severity of her physical ailments and cognitive deficits,[3] which such medications result in intermittent fatigue / diminished energy (varying severity), occasional hallucinations (varying severity), and personality / mood changes.   As evidenced by Bloom's objective medical records, her medication regimen (despite periodic, experimental adjustments to same) has failed to cure her physical ailments or associated cognitive deficits.

36.    As mentioned above, Bloom attempted a return to work from the end of May 2009 to the end of January 2010, but ultimately her physical ailments and cognitive deficits proved insurmountable.  The difficult decision to cease working was made at the end of January 2010.

### The Group Long-Term Disability Claim

37.    In conjunction with her decision to stop working, Bloom applied for group short-term disability benefits.  Hartford assigned Insured ID No. 3000158650 and approved the claim.

---

[3] Since this complaint is a public document, we refrain from listing these medications.

Group short-term disability benefits were paid through exhaustion; *i.e.*, through August 4, 2010. Hartford paid Bloom's group short-term disability benefits with its own funds.

38.     A few months before Bloom's group short-term disability benefits exhausted, Hartford notified Bloom that, if her disability benefits were to continue, she would need to apply for group long-term disability benefits.  Bloom accordingly applied for group long-term disability benefits in the Summer of 2010.  By letter dated July 7, 2010, Hartford acknowledged receipt of Bloom's group long-term disability claim.

39.     By letter dated August 3, 2010, Hartford approved Bloom's group long-term disability claim and benefit payments commenced – $4,404.78 / month (or 66 2/3% of Bloom's monthly income, *see* ¶ 17, *supra*).  After deduction of other sources of income, Bloom's monthly group long-term disability benefits totaled $2,421.78.  Hartford paid Bloom's group long-term disability benefits with its own funds.

40.     In mid-November 2010, per a whimsical determination that Bloom's disability claim was no longer supported by her "subjective" complaints, Bloom's claim was transferred to Hartford's special investigation unit ("SIU") "to see if they c[ould] impact [the] claim."  This despite Hartford's having approved Bloom's short-term and long-term disability claims based on identical complaints.

41.     Hartford's SIU immediately started to "impact" Bloom's claim; *i.e.*, began to manufacture "evidence" supportive of claim discontinuation rather than searching for more information (though it already had plenty of coverage-supportive information) to continue coverage.  For example, Hartford's SIU:  (a) requested additional proof of disability (*e.g.*, more medical records and physician opinions), (b) arranged for biased independent contractors to conduct video surveillance of Bloom (November 29-30, 2010), (c) arranged for a result oriented

Hartford field agent to interview Bloom at her house (mid-January 2011), and (d) arranged for an Independent Medical Evaluation ("IME") with a biased neurologist, Dr. Melvin Grossman ("Dr. Grossman") (May 18, 2011).

42.     By letter dated June 28, 2011, Hartford "impacted" / discontinued Bloom's claim.

43.     Hartford's decision to discontinue Bloom's claim (and to uphold its decision on appeal) fails under any applicable ERISA standard of review (wrong, unreasonable, arbitrary) for the reasons outlined in post-discontinuation letters sent to Hartford by Bloom, her mother, her boyfriend, her acquaintances, and Dr. Schiftan.

44.     Bloom's July 12, 2011 letter read, in part, as follows:

Please be advised that this letter is being written with the assistance of several family members and friends for the purposes of appealing the decision made by The Hartford to terminate my Long Term Disability (LTD) benefits.

\*\*\*

I have right sided arm and hand weakness/numbness as a result of my stroke, but I have never claimed incapacitation of my right arm, my right hand or my legs.  I am capable of doing daily tasks such as handling keys, opening and handling mail, walking, climbing stairs, etc. as long as I am well on that date.  For the purposes of my LTD with The Hartford, my truly disabling conditions are my cognitive issues and my seizures.  The weakness and numbness in my right arm and hand are secondary symptoms as a result of my stroke.  The diagnoses in my paperwork and medical chart which prohibit my abilities and functions from day to day and my ability to go back to work are the seizures and cognitive deficits.

I would also like to point out that my seizures fluctuate.  The intensity and quantity of seizures varies from day to day and week to week.  In addition, the severity and subsequent effects of the seizures on my cognitive abilities also varies in degree but greatly impacts my memory (both long-term and short-term) and word retrieval.   This is extremely frustrating and at times makes communication very difficult for me.  This is not something the video investigator would ever be able to see or accurately report, as the nature of my illness does not manifest at every moment.  There is no possible way that the video surveillance (which was only conducted on two days, which happened to be good ones for me) would be able to capture a true picture of my dysfunction.

While my seizures vary in duration and intensity, the one thing that is fairly constant is that I feel an aura come over me prior to a seizure.  The aura and the accompanying bodily sensations I experience are an indicator for me that a

seizure is going to manifest.  On those days I am homebound.  For the safety of myself and others, I avoid driving completely (I am unable to pick up my son whether it is from school, aftercare, camp, etc.) and I experience complete exhaustion and loss of overall function.  There are many days in which my mother, another family member or friend has had to assist me in caring for myself and/or my son, as basic daily functioning is not possible.  A video investigator would have no way of being privy to my functioning on my homebound days.

In addition, I would like to address the following examples of inaccurate and/or erroneous conclusions reported by the video surveillance investigator on November 29-30, 3010:

It is suggested that I 'appeared to be assisting a male companion with moving into a new home', a completely inaccurate assessment.  I was there, yes, but not moving someone into their new home.  Their move-in date was approximately a week prior to the reported date.  While under surveillance, I did accompany the homeowner while he chose and purchased a new couch but a friend helped him physically move it, not myself.  I did, however, purchase two counter stools from Target at the homeowner's request.  These counter stools were loaded into my car by a friend who met me at Target.  Upon my return, I was able to lower them onto the driveway from my SUV at which point, they were carried into the house by the homeowner as they were too heavy for me to manage on my own.  I consider myself to be a person who is a 'pusher'.  I try to live as normally as I possibly can but my limitations make some days and tasks difficult.

Surveillance also reported that 'She was not observed to walk with any observable limp'.  I have never reported an issue with my legs nor cited difficultly in walking, so that holds no bearing on my claim.  I have always maintained that I have 'good days' (days in which my functioning is at a higher level or less impaired) and 'bad days' (those in which my dysfunction is more exaggerated or I am completely impaired).  Most importantly, I have consistently stressed that my disability manifests in the form of cognitive and memory impairment coupled with seizures; which greatly inhibit my ability to function.

45.     Diana Egocheaga's (acquaintance) July 14, 2011 letter read as follows:

… I am certified Florida teacher.  This letter is written on behalf of Melissa Bloom.  I have known her and her family for about five years, since her son was in preschool and before her stroke.

During the school year I am in charge of picking up Melissa Bloom's son from school and taking care of him in aftercare at my home.  At the end of the day Melissa picks him up from me.  During the summer I am also in charge of taking care of her son during my camp program.  He is dropped off to me in the morning and picked up from me later in the day.

There are many days when Melissa has been ill and is of poor health.  I know she suffers from frequent seizures and during those times she is not able to drive. There have been many times that Melissa's mother or another family member has had to pick up or drop off her son because Melissa has had a seizure.  I have also dropped her son off at Melissa's home at the end of the day, when Melissa has had a seizure or felt it was unsafe to drive because one is coming.  Melissa and her family are very good about letting me know when she isn't feeling well and I am more than happy to help out.

If you have any questions please feel free to contact me.

46.     Helene Rendelstein's (mother) July 19, 2011 letter read as follows:

… I am writing this letter on behalf of my daughter, Melissa Bloom to report my eye witness account of various seizures she has experienced, as well as, to discuss changes in her functioning that I have noticed in her since her stroke occurred.

On March 18, 2011 … I could see [Melissa] was in a lot of pain.  While I was talking to her, she just blanked out and started having a seizure right in front of me.  She seemed frozen and did not respond when I spoke to her.  I called her name repeatedly and she just stared blankly ahead, without moving.  After the seizure, she regained awareness but was unable to talk and also unable to move her right arm for a few minutes.  This pattern continued several more times during that first hour … and each time the same thing happened during and after the seizure. …

Melissa has had other seizures that I have witnessed.  I saw her have one at a family dinner at my home.  The seizure was more severe and in addition to staring blankly and being unresponsive she experienced convulsions, which I found very frightening.  After the seizure she regained awareness but was unable to talk and again unable to move her right arm for several minutes.  She slept for hours afterward and could not leave my home until the next day.

Beyond the seizures, which vary (sometimes they are bigger and sometimes they are smaller) Melissa has had other issues since her stroke.  I see her and/or talk to her daily.  As I am her mother, I probably know better than anyone and since her stroke, she is different.  Prior to her stroke, Melissa has an impeccable memory. Now, her memory is quite poor.  I've noticed that she keeps lists and post-its in her home and carries them while she is out to remember things – something she never did before the stroke.  She also repeats the same information over and over because she forgets what she says at times.  In conversation, it sometimes seems that she just can not get out what she wants to say; she seems to be searching for words with lots of um, um, uh's… or she will use an incorrect word that sounds somewhat similar but is out of context.  Prior to Melissa's stroke, she was very quick-witted and 'got' things very quickly.  Since her stroke, she sometimes misinterprets things that are said to her and she often needs clarification before

she'll 'get' something.  There have been numerous occasions in which Melissa has expressed her frustrations to me about not being able to communicate or function as she did prior to her stroke.  She is aware that she is different than before; which greatly pains me.

Another thing that I see is that Melissa's energy level has drastically decreased. She can do things for a day or two and then the next few days she is wiped out and has to stay in and recoup.  That is difficult to watch, but the most disturbing thing to me is that she still has seizures; even though she is medicated.  Before and after seizures, I've noticed a pattern:  Melissa will slur her speech temporarily.  After a seizure, her personality is drastically different.  She appears agitated, aggressive, nasty, nervous, emotional and/or depressed and it takes her a day or two to return to herself.  She is exhausted afterward and often sleeps for long periods of time.

Regarding her career, Melissa loved working as a Speech-Language Pathologist. While I know Melissa misses working, I know in my heart she is not capable or returning to it.  Beyond her memory and her seizures, she has poor endurance. Her body and brain can not handle too much at one time.  There seems to be a trade-off; she suffers the consequences of increased seizures and decreased functioning for several days following increased activity.  While she does try to keep active, she can only do so much without it taking a toll on her.  I know this firsthand because I have to help her regularly when she is not well.  On bad days she is just not capable of caring for other people.  As a result, I often help out by taking care of my grandson.  On very bad days I take care of my daughter as well, as she is sometimes unable to take care of herself.

Please feel free to contact me if you have any questions or need additional information.  I would be more than happy to discuss this with you in further detail.

47.    Jeff Berry's (boyfriend) July 20, 2011 letter read as follows:

… I am writing this letter on behalf of my girlfriend Melissa Bloom.

To give a little background of myself I am a Firefighter/Paramedic for approximately 13 years in Palm Beach County, Florida and I have thorough understanding of many intricate medical issues as I have seen them on calls throughout the years.  These include seizures.

I see and talk to Melissa daily so I have good insight and understanding of what goes on with her medically and cognitively.

Through approximately two years that I have known her I have witnessed many seizures.  When these seizures have occurred they are varied in intensity from mild to severe.  Knowing from experience in being a Paramedic, one cannot

function during one of these episodes nor can they be productive soon there afterwards for a period of time.  In Melissa's case I have noticed that it is usually a day or two until she is back to herself.

When she has the seizures (the mild ones) she usually has a glazed look in her eyes, stares blankly, cannot move or talk and it affects her speech and right arm afterwards for a few minutes.  During the more severe seizures she convulses, becomes rigid and is not able to speak.  She cannot speak or move her right arm for a few minutes when it is over and she is also extremely fatigued afterwards. With all of the seizures she becomes severely emotional, her personality is changed, she becomes aggressive at times and is just not herself.

As far as her cognition and memory she has difficulty staying on topic, repeats herself, has lack of focus and poor memory.  With all this said it is very hard for Melissa to be a functioning part of society at times, which I know is very hard for her.

In conclusion feel free to contact me if you have any other questions about this matter.

48.     Valerie Goldman's (acquaintance) July 21, 2011 letter read as follows:

… I am writing this letter on behalf of Melissa Bloom, who I have known for several years.  She worked at the facility where my aunt was in a nursing home, and treated my aunt for speech and swallowing issues following a stroke.  I always knew Melissa to be organized, concise, professional, insightful and especially caring in her position at the facility.  We grew to be close as the years went by.

On May 18, 2011 Melissa asked me to accompany her to a doctor's visit, which was required by the insurance company.  She was not feeling well prior to the visit, as she was recovering from surgery.  Besides the surgical recovery, she especially was not feeling well on the day of her appointment and told me she felt like a seizure might be coming on.  Her speech was very slow and she seemed very out of it.

As we met the doctor, he repeatedly asked Melissa what she was doing there.  She answered several times, 'The insurance company sent me'.  The doctor seemed bewildered and acted as if there was a mistake.  He shook his head in what appeared to be disbelief that she was there on behalf of the insurance company, and then he took out a form and began asking Melissa about her medical issues and was writing them down.  It was apparent by looking and talking to her that day that she was not well.  Her speech was not clear that day and she hesitated and paused frequently while trying to answer the questions.  She was having difficulty concentrating, remembering, answering questions and seemed generally confused.  Keeping up with the conversation also appeared difficult for Melissa

and it took her a while to get out the answers.  It was suggested that she start from recent and then work backwards to make things easier for her to recall.

After all of the questions, the doctor asked Melissa to step into a medical examination room to do an exam.  As soon as the three of us stepped into the room, the doctor began talking about his life.  He told us he was a widower, and rescued dogs, and told us he had many dogs.  It seemed a bit odd to me that he would talk about his personal life, and this did not seem very professional to me at all.  He then began talking about current events, in which I was doing all the talking while Melissa listened, unable to completely focus or concentrate on the conversation going on around her.  As he was examining her, he stated that one side of her body was much weaker than the other, and told her it was obvious she had neurological issues.  He then asked her questions about her seizures and discussed how they effect her day to day.  He also asked her about her activity level and how her issues effect her daily.  Melissa was very honest with him and told him that she tries to get involved in activities but that she gets exhausted and has seizures frequently.  I know this to be true as I see Melissa has to stay home on many days due to not being well after having seizures.  The doctor clearly stated that she was not able to go to work due to the seizures and her cognition and that he would complete his report to verify this status.  At that point, as we were leaving, he suggested that Melissa find a hobby to keep her brain active.

I was shocked when Melissa called me and told me her insurance was terminated, resulting from this doctor's report.  I know what he stated in the report was clearly not what transpired between the three of us that day.  I was a witness to the entire office visit, and clearly, this doctor was only acting in his best interest, on the insurance company's behalf.  I will be more than happy to verify these statements, as I know an injustice has been served.  If you would like to contact me, I am available to discuss these issues. …

49.    Bloom's August 8, 2011 letter read as follows:

Please consider this letter an addendum to my July 12, 2011 letter written to the Hartford appealing the decision to terminate my long term disability coverage. While I have been previously informed in a letter by The Hartford of the basic contents of the independent medical examination (IME) report submitted by Dr. Melvin Grossman, it was not until today that I received and reviewed a copy of his report for myself.  At this time I feel it is necessary that I address several issues, as well as , additional inaccuracies and/or erroneous statements that were written by Dr. Grossman in his report that I had not previously been aware of.

1. It was my understanding that the IME was supposed to be an independent and impartial examination administered by an OBJECTIVE third party (Dr. Melvin Grossman).  However, Dr. Grossman states in his report that he was provided with a copy of the surveillance video of me, which he viewed to ascertain my level of functioning.  As the surveillance video was commissioned by you and

could only have been provided to Dr. Grossman by your insurance company, it is highly questionable and unlikely that Dr. Grossman was impartial.  Quite frankly, in my opinion being given the surveillance video, without communication from my neurologist to you, is highly prejudicial.  Additionally, as cited in my previous letter to The Hartford, the surveillance was conducted on only two of my 'good' days and both the video investigator and Dr. Grossman made grossly erroneous assumptions and judgments based on the above-referenced video as to my overall status.  Please refer to my previous communication in my appeal letter to The Hartford for more details.

2.  In his IME report, Dr. Grossman reported several inaccuracies in sections of my history:  past medical, review of symptoms and socioeconomic.  Examples include, stating that I am currently married (he was clearly told I was divorced) and stating that I had surgery 'a year and a month ago' to remove an ovarian cyst.  He was clearly told the surgery was in March of this year (two months prior to the IME, not a year and a month as he stated in the report).  Dr. Grossman also stated that I do 'a lot of charity work' which is inaccurate.  I told him I did charity work briefly in the past and liked it, but was unable to do so at this time due to my deficits.  It was then that he suggested I find a hobby to keep me busy and my brain active.  These are a few examples, however there were several other inaccuracies in the IME report, which I would be happy to address if The Hartford would like to discuss them with me or my representative in further detail.  I mention these examples to illustrate that Dr. Grossman is not a credible source as he was unable to accurately report basic medical history and/or accurate verbal statements made to him during the IME.  These inaccuracies are disturbing and important as they call into question his ability to assess, interpret and/or report details with accuracy, as a professional and competent medical practitioner is required to do.  As a neurologist, especially someone who is given free reign to determine what my abilities and/or deficits are, Dr. Grossman should be clear, concise and most especially accurate; which he was not.

3.  As the accuracy of Dr. Grossman's reporting skills are in question, I feel the need to reiterate to you at this time that the veracity of Dr. Grossman's statements as to what transpired during the neurological examination at his office are also in question.  In my previous correspondence to you (for the purposes of my appeal) there is a signed and notarized letter from Valerie Goldman, a friend who accompanied me to the May 18, 2011 neurological examination, attesting as to what actually happened during that office visit.  In his report, Dr. Grossman indeed confirms the presence of my companion, Valerie Goldman.  Please note that her statement greatly conflicts with the statements made by Dr. Grossman in the IME report.  Please refer to my prior correspondence and review Valerie Goldman's signed and notarized statement as she was a witness for the entire duration of the IME.  In addition, Ms. Goldman can be contacted via telephone at the telephone number provided to the Hartford on her statement.

CASE NO.:  9:11-cv-81393-KLR

Enclosed is a statement from my neurologist, Dr. Robert Schiftan for your review. Dr. Schiftan has been my neurologist from the time of my stroke until present and can speak of my abilities, deficits and daily functioning in specific and adequate detail.  Feel free to contact him via telephone with any additional questions you may have.

Thank you for your consideration regarding this matter.

50.     Dr. Schiftan's statement, enclosed in Bloom's August 8, 2011 letter, read as follows:

This is a letter regarding my patient Melissa Bloom… .  The patient was first evaluated March 17th 2009 when she presented to Boca Community Hospital with slurred speech, right arm numbness and weakness.  And she was found to have left cerebral infarction.  She developed seizures including partial complex and absence.  She is on Keppra but absence seizures still occur almost daily and partial complex seizures occur on average 1-2 times a month and are associated with dysphasia, right side weakness, confusion and she develops postictal lethargy.  The patient has developed difficulties with concentrating, focusing and memory issues since her stroke.

As part of evaluation of her stroke she has hypercoagulable state and found to have MTHFR coagulation abnormality and associated low B12 and elevated homocystine level.  In addition, her ambulatory EEG was abnormal.

Since she is having frequent seizures and has episodes of difficulty with speech and concentration she continues to be unable to work at this time.  She remains disabled due to her stroke and frequent seizures.

It is not possible to predict when those seizures will occur and she may have periods during the day when she can function normally but because of periodic nature of the seizures she cannot hold a job at this time.  I am continuing to adjust her antiepileptic medication to get the seizures under better control.

Please reconsider your decision and continue her long-term disability benefits based on the above information.

51.     These letters would have persuaded an unbiased insurance company to continue coverage rather than discontinue same as a result of evidence manufactured during the claim "impacting" process, which such "impacting" process was doubtless triggered by carrier protocol requiring approved claims to be reevaluated at a certain point in an effort to discontinue same.

52.     By letter dated August 15, 2011, Hartford acknowledged receipt of Bloom's appeal.

53.     By letter dated October 6, 2011, Hartford ratified its claim discontinuation.  The appeal department's October 6, 2011, letter essentially repeated the SIU's bases for discontinuation and added one more basis – Dr. Beatrice Engstrand's ("Dr. Engstrand") October 5, 2011 report, premised on a mere paper review of Hartford's file.  Hartford's ratification of claim discontinuation was wrong, unreasonable, and arbitrary for all the same reasons Hartford's claim discontinuation was wrong, unreasonable, and arbitrary, as articulated in the above quoted correspondence.

54.     In sum, Bloom's complaints of physical and cognitive impairments changed not at all from the time Hartford approved Bloom's short-term and long-term disability claims to the time Hartford discontinued the latter.  Hartford's deciding to send Bloom's claim to SIU for "impact[ing]," based on the carrier's out of the blue (November 2010) belief that Bloom's complaints were no longer good enough, was arbitrary and capricious at best.  In the non-ERISA context, Hartford's subsequent manufacturing of "evidence" employed under the umbrella of indifference to truth now common in ERISA denials would be shocking evidence of bad faith claim handling under state standards.   In the ERISA context, the palliative expression is unreasonable claim handling.

55.     Hartford's reasons for claim discontinuation, as set forth in Hartford's June 28, 2011 and October 6, 2011 letters, largely pertain to the carrier's belief that Bloom can perform the physical duties of her profession, which, according to Hartford, include being able to "lift up to 20 pounds occasionally" and frequently "bend, stoop, crouch, walk and stand."  Such physical abilities are certainly germane to an occupation of manual labor, but are no more related to the duties of a speech pathology occupation requiring high level cognitive acuity than flashlights are to waterfalls or Congress is to progress.

56.     While physical requirements may be tangentially associated with a speech pathology occupation, they are by no means "essential duties" of a speech pathologist, and the Certificate clearly equates disability with an inability to perform "one or more of the Essential Duties" of an insured's occupation; *i.e.*, the Certificate clearly states that "incidental" duties are not "Essential Duties."   Seizure, speech difficulties, memory loss, fatigue, hallucination, migraines, and/or vision difficulties hardly allow for clear cognitive function or a fulltime work week.

57.     Hartford's June 28, 2011 letter briefly conveys the belief that Bloom can adequately communicate.  This may be true on some days, but certainly not all days, and a *prima facie* "Essential Duty" of speech therapy is the ability to consistently communicate at a high level.  Regardless, Bloom's alleged ability to adequately communicate does not somehow enable her to perform all of the other "Essential Duties" of her occupation that she is unable to perform (*e.g.*, patient diagnosis; patient treatment; precise documentation of patient diagnosis, prognosis, treatment plan, and treatment progress; coordination of patient care with multiple disciplines; comprehension and application of laws and regulations governing patient care; and billing).  And to qualify as "disabled" under the Certificate, Bloom need only be unable to perform *one* "Essential Duty" of her occupation.

58.     Hartford's October 6, 2011 letter touches upon Bloom's cognitive abilities, actually contending, per Dr. Engstrand, that Bloom is able to perform the cognitive duties of her profession without restriction because surveillance showed Bloom "purchas[ing] food at a vending machine, convers[ing] with others, go[ing] shopping, run[ning] errands, and driv[ing]" and being "aware [of her] surroundings."

59.     In sum, Hartford's position that Bloom can perform the "Essential Duties" of a speech pathologist was based on this insurer's one-size-fits-all formulaic description of "duties," not based on the description of either Bloom's job duties provided to Hartford by RehabCare, or, for that matter, of this sort of occupational responsibility within the vague confines of a "national economy."   The Certificate does not accord Hartford the freedom to redefine the "Essential Duties" of an occupation to conform with its chosen format.   Bloom's medical records, the testimonials provided to Hartford by individuals who regularly witness(ed) Bloom both in and out of work, and other information provided to Hartford by Bloom during the claim and appeal processes evidence that Bloom is disabled per the plain Certificate language cited above; *i.e.*, Bloom cannot perform at least *one* of the "Essential Duties" of her occupation.

60.     Hartford's claim decision also runs contrary to that of the United States Government.   In February 2011, after considering far less than the coverage-supportive information before Hartford at the time of claim discontinuation and ratification of claim discontinuation, Bloom's claim for Social Security Disability benefits was approved beginning July 2010.  The Social Security website provides as follows:

> 'Disability' under Social Security is based on your inability to work.  We consider you disabled under Social Security rules if:
>
> - You cannot do work that you did before;
> - We decide that you cannot adjust to other work because of your medical condition(s); **and**
> - Your disability has lasted or is expected to last for at least one year or to result in death.
>
> ***
>
> If you cannot do the work you did in the past, we see if you are able to adjust to other work.  We consider your medical conditions and your age, education, past work experience and any transferable skills you may have.  If you cannot adjust to other work, your claim will be approved.  If you can adjust to other work, your claim will be denied.

The Social Security Administration properly determined that Bloom's ailments prevent her from adjusting to "other work," whereas Hartford has improperly determined that Bloom was no longer disabled under a less stringent, "Your Occupation" standard.

### *The Group Life Insurance Coverage*

61.     By letter dated November 23, 2010, Hartford advised Bloom:

We have completed our review of your claim for Waiver of Premium benefits under the above Group Life insurance Policy RehabCare Group, Inc. and have determined that in accordance with the applicable Policy provisions you are eligible for these benefits effective July 28, 2010.  Under the provisions of this Policy, your Group Life insurance benefit $80,000.00 in Basic coverage will remain in effect without premium payment until date of termination July 31, 2038, provided you remain Disabled as defined by the Policy.

62.     Following Hartford's June 2011 disability claim discontinuation, Hartford, by letter dated July 9, 2011, advised Bloom that her basic group life insurance "premium waiver ha[d] been denied, terminated or reduced."  The letter further advised Bloom that she had "the option of converting the premium waiver benefit or reduced amount to an individual life policy."

63.     The individual life insurance coverage Hartford offered to Bloom equaled her basic group coverage – $80,000.00.  The quoted premium for the individual life insurance coverage Hartford offered was $242.42 / month, whereas her premium contribution for basic group coverage was $0 / month.  Unable to afford the quoted premium, Bloom passed on converting her basic group life insurance coverage to individual life insurance coverage.

64.     The propriety of Hartford's discontinuation of Bloom's basic group life insurance coverage and premium waiver is fully contingent on the propriety of Hartford's discontinuation of Bloom's group disability coverage.

## COUNT I – RECOVERY OF PAST-DUE BENEFITS AND REINSTATEMENT OF CLAIM AND COVERAGE UNDER ERISA, TITLE 29, UNITED STATES CODE, SECTION 1132(a)(1)(B)

65.     Bloom re-alleges Paragraphs 1 through 64 as if fully set forth herein.

66.     This is a claim to recover past-due disability benefits, reinstate the disability claim, reinstate the basic life insurance coverage under premium waiver, and otherwise enforce rights under Title 29, United States Code, Section 1132(a)(1)(B).

67.     Pursuant to Section 1132(a)(1)(B), Bloom, as a participant in the Plan and Life Plan, is entitled to sue for judicial determination and enforcement of benefits and coverage.

68.     Hartford has refused to continue payment of the disability benefits to which Bloom is entitled under the Certificate and in contravention of ERISA.

69.     Hartford has refused to continue the Life Policy under premium waiver, despite Bloom's entitlement to same under the Life Certificate and in contravention of ERISA.

70.     Bloom has no other adequate remedy at law to address the injuries she has suffered as a result of Hartford's discontinuation of her disability claim and basic group life insurance coverage under premium waiver.

71.     As a result of Hartford's discontinuation of Bloom's disability claim and basic group life insurance coverage under premium waiver, she has been forced to retain legal counsel to represent her in this matter and, therefore, is entitled to recover her reasonable attorney's fees and costs pursuant to Title 29, United States Code, Section 1132(g)(1).

WHEREFORE, Plaintiff, Melissa R. Bloom, respectfully requests the entry of judgment against Defendant, Hartford Life and Accident Insurance Company, for damages including, but not limited to, past-due contractual disability benefits, reinstatement of her group long-term disability claim, reinstatement of her basic group life insurance coverage under premium waiver,

CASE NO.:  9:11-cv-81393-KLR

attorney's fees pursuant to Title 29, United States Code, Section 1132(g)(1), costs incurred bringing this action, and for such other relief as this Court deems equitable, just and proper.

Dated this 16th day of April, 2012.

Respectfully submitted,

**VER PLOEG & LUMPKIN, P.A.**
100 S.E. Second Street, 30th Floor
Miami, FL  33131
(305) 577-3996
(305) 577 3558 *facsimile*


/s/ Brenton N. Ver Ploeg
**Brenton N. Ver Ploeg**
Florida Bar No. 171470
bverploeg@vpl-law.com
**Jeffrey L. Greyber**
Florida Bar No. 41103
jgreyber@vpl-law.com


## CERTIFICATE OF SERVICE

I hereby certify that on April 16, 2012, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the below Service List *via* transmission of Notice of Electronic Filing generated by CM/ECF.


/s/ Brenton N. Ver Ploeg
**Brenton N. Ver Ploeg**

CASE NO.:  9:11-cv-81393-KLR

## <u>SERVICE LIST</u>
### <u>Case No.:  9:11-cv-81393-KLR</u>

**Shutts & Bowen LLP**
1500 Miami Center
201 South Biscayne Blvd.
Miami, FL 33131
(305) 347-7390
(305) 347-7790 *facsimile*
**William J. Gallwey, III, Esq.**
Florida Bar No. 199133
wgallwey@shutts.com
**Jonathan M. Fordin, Esq.**
Florida Bar No. 371637
jfordin@shutts.com
**Jerel C. Dawson, Esq.**
Florida Bar No. 152390
jdawson@shutts.com
*Attorneys for Defendant*